Kenneth HEAGY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 449–83C.

United States Claims Court.

July 20, 1987.

Calvin R. Jones, Anchorage, Alaska, for plaintiff.

Alvin A. Schall, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, and Thomas W. Petersen, Washington, D.C., for defendant; Nettie Alvarez, Dept. of Housing and Urban Development, Seattle, Wash., of counsel.

## OPINION

BRUGGINK, Judge.

### INTRODUCTION

This action is before the court on defendant's motion for summary judgment. Plaintiff Heagy alleges in his complaint that defendant, acting through the Department of Housing and Urban Development ("HUD"), breached an agreement arising out of HUD's guarantee of a mortgage loan to Heagy; that HUD's conduct was in violation of the equal protection and due process clauses of the fifth and fourteenth amendment to the United States Constitution and that its failure to postpone foreclosure was arbitrary and capricious. For the reasons stated below, defendant's motion is granted, although it is in part treated as a motion to dismiss for lack of jurisdiction.

### FACTUAL BACKGROUND

Plaintiff Heagy is the former owner of a 27–unit housing project located in Anchorage, Alaska which he purchased in 1973 from Lee and Laura Reed. On November 3, 1970 the Reeds executed a deed of trust promissory note ("the note") in the principal amount of $477,900.00 payable to the Matanuska Valley Bank of Anchorage. The note was secured by a deed of trust ("the mortgage") executed on the same day by the Reeds. Both the note and the mortgage were insured by HUD pursuant to Section 207 of the National Housing Act, 12 U.S.C. § 1713 (1976).

The mortgage was also subject to a regulatory agreement executed by the Reeds and HUD on November 3, 1970. Section 4(c) of the agreement addressed the procedure by which HUD would respond to written requests for rent increases. It provided as follows:

(c) The Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance cost over which Owners have no effective control, or

(ii) Deny the increase stating the reasons therefor.

In December 1971 the mortgagee bank assigned its interest in the note and mortgage to the Federal National Mortgage Association ("FNMA"). When Heagy purchased the project from the Reeds he executed an assumption agreement by which he agreed to be bound by the note, mortgage and the regulatory agreement. On June 28, 1974 FNMA and Heagy entered a second agreement modifying the terms of the note to defer payments of principal from April 1, 1974 through September 1, 1974, ("the modification agreement"). The modification agreement also provided for specially calculated payments through May 1, 1975 in order to permit Heagy's repayment of a delinquency that had accrued as of May 31, 1974.

In his affidavit, Heagy states that the modification agreement was necessitated by initial financial difficulties he encountered with the project. These difficulties allegedly stemmed from the fact that the apartments were in a state of serious disrepair at the time of purchase and were suffering a vacancy factor in excess of 50%. Heagy also states that the actual occupancy and rental rates were lower than what had been represented to him by the Reeds before purchase and that the condition of

the project required his investment of approximately $20,000.00 in capital improvements.

In 1975, Mr. Heagy requested two rent increases from HUD which were promptly granted. With both these requests, Heagy submitted unaudited financial information to substantiate his increased expenses. HUD's March 18, 1975 letter to Heagy approving a rent increase in the amount of $140,604.00 contained a typographical error. This error was later corrected to reflect HUD's approval of a rent increase in the amount of $104,604.00. On November 14, 1975 Heagy's second request for a rent increase was approved by HUD in the amount of $106,768.00. For both 1975 rent increase requests, HUD required the return of HUD Form 92458 ten days after Heagy's receipt of the approval letter.

Two years later, Heagy again requested a rent increase for the housing project in a letter dated March 26, 1977. He substantiated the request with unaudited financial statements. In his affidavit Heagy states that he was:

> told by HUD personnel that in order to substantiate my need for [a] rent increase I would have to submit audited financial statements.... [A]udited financial statements ... would possibly get me an approximate $14.00 per unit monthly rent increase. I had numerous conversations with HUD officials and informed them that the net increase of $4,368.00 per annum would cost me $5,000.00 in accountant's fees. Further, I indicated to them that this would not allow me to continue to pay the mortgage while curing many of the maintenance problems. HUD's response was that I could add the audit expense to a subsequent rent increase the following year.[1]

The record contains two HUD documents which discuss the disposition of plaintiff's March 1977 rent increase request. The identical forms are entitled Memorandum for File, and are signed by the Director of the Housing Management Division, Robert Prescott. They both reflect "Action Required" and "Action Taken" due to the request. The "Action Required" under the first memorandum, dated April 26, 1977, is "[a]pproval of requested rent increase." The "Action Taken" section of that memorandum states, "Approval of 4% increase, half of which is for increased deposits to R & R account." The action required by the second memorandum, dated six months later, October 26, 1977, is to "[r]econsider rent increase approved in April, 1977 after Mr. Heagy provides us with current year financial data." The action taken was to give Heagy forms for monthly accounting reports. The "Comments" section of the October memorandum notes that Heagy "did not implement the $15 per month increase approved by HUD in April 1977, since he was afraid it would produce more vacancy loss than additional income." It also notes that the HUD file contained no documentation as to whether Heagy was ever offered or rejected the increase.

Although there are no documents to substantiate a subsequent request for a rent increase, Heagy states in his affidavit that he had audited statements prepared for 1978, and forwarded them to HUD with a request for a rent increase, which he says was refused. On September 17, 1979 FNMA assigned its interest in the note and mortgage to HUD. HUD informed Heagy of their dissatisfaction with his management of the property because "deferred maintenance" was not being adequately performed. As a result Heagy placed the project with a management company and directed them to place all funds into maintenance. At this point, default began to occur under the mortgage. In order to cure the default, Heagy attempted to obtain a supplemental loan from the mortgagee, Matanuska Valley Bank. The loan, however, was contingent upon permission from HUD, which was denied. HUD allegedly denied permission because Heagy

---

**1.** Defendant did not agree to this recitation, instead reserving the right to challenge it and related statements by Heagy at a later time. Because Heagy is the non-moving party, however, on motion for summary judgment the court will assume Heagy's statements are correct insofar as they are factual assertions, unless directly contrary to other stipulated facts.

wanted to perform "deferred maintenance" as opposed to "rehabilitation".

In the fall of 1980, Heagy attempted to rehabilitate the apartments by converting them to low cost condominiums. The financing institution, Alaska Mutual Bank, however, required that HUD subordinate its first mortgage on the project before it would grant a loan to finance the conversion, which HUD refused to do. As of December 1, 1980, Heagy owed HUD approximately $87,556.52 in overdue mortgage payments.

HUD filed a notice of default and election to sell with respect to the project on January 28, 1981. HUD's Director of the Office of Regional Housing informed the Anchorage office in an April 7, 1981 memorandum that foreclosure proceedings would be deferred for 60 days in order to allow Heagy time to obtain refinancing. Two days before July 10, 1981, the date set for the sale, Heagy's attorney informed HUD Loan Specialist Patricia Brown that Alaska Housing Finance Corporation had refused financing. At that time, the attorney requested another 30 to 60 day postponement of the foreclosure sale. No action was taken by HUD on his request. On the morning of July 10 Heagy delivered a document to HUD stating that an individual named Hudson Boyd would provide $122,000.00 to bring Heagy's mortgage current but that a five day delay in the foreclosure proceedings was necessary in order to transfer the funds. Despite this effort by Heagy, the project was sold at a foreclosure sale on July 10, 1981.

## DISCUSSION

Plaintiff brought suit in the Claims Court alleging damages in excess of $100,000.00 caused by HUD's actions. Specifically, Heagy seeks relief on three grounds: first, he seeks this court's review under the Administrative Procedure Act, 5 U.S.C. §§ 551–59, 701–706 (1982) ("APA"), of the allegedly arbitrary and capricious acts of HUD in denying rent increases and in foreclosing on the mortgage; second, he claims a breach of the regulatory agreement; and third, he claims violations of the due process and equal protection clauses of the fifth and fourteenth amendments.

■ This is a court of limited jurisdiction which may not entertain claims which fall outside its specific grants of review authority. It has been frequently stated, but it bears repeating that waivers of sovereign immunity must be narrowly construed. *See United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969); *United States v. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941); *Kabua v. United States,* 212 Ct.Cl. 160, 167, 546 F.2d 381, 385 (1976), *cert. denied,* 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977). The jurisdictional grant relevant here is the Tucker Act, pursuant to which the court is given the following jurisdiction:

> The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (1982). This statute is only jurisdictional, however, and does not create any substantive right enforceable against the United States for money damages. *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *Alexander v. United States,* 5 Cl.Ct. 57, 60 (1984), *aff'd mem.,* 758 F.2d 667 (Fed.Cir.1984). The act merely confers jurisdiction in the event that a substantive right to sue the government already exists.

■ In order, therefore, to invoke the jurisdiction of the Claims Court on the basis of an alleged statutory or constitutional violation, Heagy must rely on a provision mandating that compensation be paid by the federal government for the damage sustained. *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 392 F.2d 1002 (1967). Heagy's attempts to obtain review under the APA and for alleged violation of the due process and the equal protection clauses are deficient in that none

of those provisions mandate the payment of money damages by the government to plaintiff. As the Supreme Court held in *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977), the APA is not an independent source of jurisdiction for any court. Since there is no generalized authority for this court to review agency actions, the review standard created by the APA is simply not applicable in the Claims Court. *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1375 (Fed.Cir.1983); *Costner v. United States,* 229 Ct.Cl. 87, 89 n. 5, 665 F.2d 1016, 1017 n. 5 (1981). Similarly, it has been held on numerous occasions that our jurisdiction does not extend to review actions under the due process or equal protection clauses of the fifth and fourteenth amendments. *See, e.g., Montalvo v. United States,* 231 Ct.Cl. 980, 982–83 (1982) (due process clause); *J & L Janitorial Serv. Inc. v. United States,* 231 Ct.Cl. 837, 838 (1982) (due process and equal protection clauses); *Bounds v. United States,* 1 Cl.Ct. 215, 216 (1983), *aff'd,* 723 F.2d 68 (Fed.Cir.1983) (equal protection clause). Those three claims must therefore be dismissed for lack of jurisdiction.

■ Heagy, in response to defendant's jurisdictional arguments, also argues that 42 U.S.C. § 1404a (1982), and 12 U.S.C. § 1702 (1982), constitute a waiver of sovereign immunity and give a right to an action for damages. Section 1702 authorizes the Secretary of HUD to sue and be sued. Section 1404a is a similar provision with respect to the United States Housing Authority. Neither section, however, nor related statutory provisions, create a substantive monetary right enforceable against the Government, necessary to an action here. *United States v. Adams, Hunter, Receiver for CDI,* 634 F.2d 1261 (10th Cir.1980), cited by Heagy, is not to the contrary. There a building contractor sued HUD in connection with a contract to build houses. Plaintiff seriously misreads *CDI* when he cites it for the proposition that the court of appeals suggested this court would have jurisdiction over a claim under § 1404a or § 1702. Rather, it found that the district court had properly dismissed the claim under those sections, say-

ing sovereign immunity had not been waived as to the particular claims brought. That same analysis would apply here. It did go on to say that the predecessor to this court would have jurisdiction over the remaining *contract* claim under the Tucker Act. There is no dispute as to that proposition, however. To the extent Heagy can point to a particular contract provision, its claim will be considered. Consequently only plaintiff's claim for breach of the contract is properly before the court under § 1491.

*The Breach of Contract Claim*

Summary judgment may be granted when it is shown that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

At the summary judgment stage, the function of the trial judge is not to weigh the evidence and determine the the matter on the merits but rather to determine whether there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If there are no genuine factual issues that may reasonably be resolved in favor of either party and which thus require resolution by a finder of fact then the case need not proceed to trial and summary judgment may be granted. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In reviewing the record for evidentiary conflicts, "mere denials or conclusory statements" are insufficient to generate a fact issue. *Marquardt Co. v. United States,* 822 F.2d 1573, 1576 (Fed.Cir.1987). Although there are differences in the conclusions which the parties draw from the facts, and there are superficial discrepancies in the stipulations, the court concludes that the case can be resolved through summary judgment.

■ The precise acts of defendant which allegedly constitute a breach of contract are less than clear. A generous reading of the complaint is that Heagy argues that the following actions by HUD constitute a breach of contract: alleged failure to *au-*

*thorize* the requested rent increases of 1977 and 1979; failure to provide *written denials*; and failure to supply *written explanations* for the denials. The simple answer to these allegations is that even if the allegations are factually correct, these actions do not constitute a breach of the regulatory agreement. The only requirement under the agreement upon receipt of a written request for a rent increase is that the Secretary "within a reasonable period of time," either approve the increase or deny it. If the increase is denied, the reasons must be stated.

The most plausible reading of the facts is that within a short period of time after reviewing Heagy's April 1977 request, he was contacted, probably by telephone, by HUD officials who told him that they would approve a $14–$15 per unit per month rent increase. This clearly appears from the April 26 and October 26 memoranda. Although Heagy contends that he was told to provide audited figures, his statement does no more than suggest that the approval was conditional. Heagy admits that he was told he could "possibly" get the increase. Even if HUD did attach such a condition, in any event, two things are clear. First, HUD approved, even if conditionally, the increase. Second, even if the condition of an audit is seen as a denial[2] and not consistent with previous patterns of approval, this would not constitute a breach of the agreement. It was within HUD's discretion to ask for audited figures. Section 4(c) of the agreement specifically provides that requests must be "properly supported by substantial evidence." A requirement of audited figures is within that discretion.

Assuming these actions constituted a denial, they were clearly communicated to Heagy. In his own affidavit he states there were "numerous" conversations with HUD officials concerning the April application, all of which conveyed, by his description, the requirement of audited figures. This would meet the contract requirement of a denial with reasons. There is no requirement that the denial or the reasons be given in writing.

There can be no serious argument that Heagy's alleged 1979 request, of which defendant has no record, was denied without reasons. In his affidavit Heagy states that "HUD indicated that the rent increase was refused ... [because] the market was depressed and would not bear the rents, and further that they wanted the maintenance to be brought current before any increase would be granted." Apparently, Heagy was well informed of the reasons.

Therefore, despite the factual inconsistencies present in the record, there is no genuine issue as to any material fact which would require that defendant's motion for summary judgment be denied.

One additional construction of Heagy's breach of contract argument is that the failure to *grant* an increase was a breach itself. The agreement does not require approval of all rent increases. To the extent Heagy is arguing that the denial was an abuse of agency discretion, that issue, as discussed in connection with the APA, is not before this court. Although as plaintiff points out through his reference to *Angleton v. Pierce*, 574 F.Supp. 719, 729 (D.N.J.1983) district courts may consider an allegation that agency action violated a statute or regulation, however, unless that provision is money-mandating, the Claims

2. The documentary evidence leaves no real doubt that there was approval. The two memoranda signed by Prescott indicate that Heagy's March rent increase request was granted. The October memorandum documents a personal visit between Heagy and Prescott during which it can be inferred that Heagy was made aware of HUD's rent increase approval in April 1977. Moreover, the Memorandum indicates that the rent increase approved in 1977 would be reconsidered after Heagy provided current year financial data; not that approval of the rent increase was contingent upon submission of audited financial statements as Heagy alleges in his affidavit. In fact, among the recommendations made by Prescott as a result of his meeting with Heagy to help solve some of the project's problems was implementation of the previously approved rent increase of $15 per month. Heagy's response to this recommendation was that a large rent increase may adversely affect the project's occupancy and that he wanted to avoid prolonged vacancies during the winter months.

**700**

Court has no authority to hear the case. Therefore, a review of whether HUD actions were in violation of statutory or regulatory procedure, or constituted an abuse of discretion must take place, if anywhere, in district court.

*The Foreclosure Claim*

■ It is difficult to determine if Heagy's challenge to the foreclosure is based on a breach of contract, or a violation of a regulation. If the latter, then for reasons set out in connection with the limitations on this court's review of agency actions, the claim fails here. Even assuming that the agency's discretionary decision is reviewable by any court, *see United States v. OCCI Co.*, 758 F.2d 1160 (7th Cir.1985), it is not reviewable here. As to a possible breach of contract argument, it too would fail. The agency is plainly given authority to foreclose upon default by the note, the mortgage, and by 12 U.S.C. § 1713(k) (1982). Heagy does not question whether there was a default. Instead he relies on *United States v. Golden Acres, Inc.*, 520 F.Supp. 1073 (D.Del.1981), and *Kent Farm Co. v. Hills*, 417 F.Supp. 297 (D.D.C.1976), for the proposition that HUD's decision to foreclose may not be based only upon a monetary default but must also take into consideration the objectives of the National Housing Act. Plaintiff is unable to point to any contract provision embodying those objectives which was violated here. Whether or not HUD's decision to foreclose on the mortgage was in keeping with the objectives of the National Housing Act is not a question for this court to address when considering a claim for breach of the agreement in question. Whether or not HUD acted unreasonably by not adequately considering plaintiff's suggested alternatives to foreclosure is not relevant to consideration of the contract action which is the only claim properly before this court. On that claim, as previously noted, the court finds that there was no breach.

## CONCLUSION

Plaintiff's claims based on the APA, the equal protection clause, the due process clause, 12 U.S.C. § 1702 and 42 U.S.C. § 1404a are dismissed for lack of jurisdiction. Defendant's motion for summary judgment is granted as to plaintiff's breach of contract claim. The Clerk is directed to dismiss the complaint. Each side to bear its own costs.